IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RANDY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-667-SMD |
| | ) | |
| GOLDEN PEANUT COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION & ORDER

Plaintiff Randy Williams ("Williams") brings this suit against his former employer, Defendant Golden Peanut Company, LLC ("Golden Peanut"). *Compl.* (Doc. 1-1) p. 1. Williams alleges that Golden Peanut discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). *Id.* at 3–6. Golden Peanut now moves for summary judgment on Williams's claims. *Def.'s Summ. J. Mot.* (Doc. 20) p. 1. For the following reasons, the Court GRANTS Golden Peanut's motion and DISMISSES Williams's claims WITH PREJUDICE.[1]

## I.     UNDISPUTED MATERIAL FACTS

Golden Peanut is in the peanut business. *Def.'s Br. in Supp. of Summ. J.* (Doc. 21) p. 2. Golden Peanut offers "a full line of premium and nutritious wholesale peanut products," including peanut oil, peanut flour, and hull and fiber. *Id.* A "hull" is the shell of a peanut. *Williams Dep.* (Doc. 22-1) p. 30. One of Golden Peanut's facilities is located in

---

[1] The parties have consented to the undersigned Magistrate Judge conducting all proceedings and entering judgment in this case under 28 U.S.C. § 636(c). *Pl.'s Consent* (Doc. 9) p. 1; *Def.'s Consent* (Doc. 10) p. 1.

Headland, Alabama, and includes a hull and fiber manufacturing plant. *Def.'s Br. in Supp. of Summ. J.* (Doc. 21) pp. 2–3.

Randy Williams is a Black male who lacks a high school diploma or GED. *Williams Dep.* (Doc. 22-1) pp. 6–7, 61. He is certified to operate a skid steer[2] and a forklift, but otherwise has no specialized training in the workforce. *Id.* at 7. In February 2014, Williams began working full time at Golden Peanut's Headland Facility. *Id.* at 27–28. He became a skid-steer operator at the hull and fiber plant four months later. *Id.* at 30. In that role, Williams operated a skid steer to move hulls and clean warehouses. *Id.* at 30–31. He also assisted the leadman on duty and occasionally loaded trucks. *Id.*

In January 2015, Williams filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Middle District of Alabama. *Bankruptcy Pet.* (Doc. 22-7) pp. 6–7. Williams's bankruptcy petition required him to list any "contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." *Id.* at 15. Williams marked that he had no such claims and affirmed the accuracy of his petition under penalty of perjury. *Id.* at 15, 44. Two months later, Williams filed an amended petition to add adequate protection payments for certain creditors. *Bankruptcy Docket* (Doc. 22-10) p. 4.

Back at Golden Peanut, in July 2018, a leadman position became available in the hull and fiber plant. *Williams Dep.* (Doc. 22-1) pp. 34, 161–62. Broadly speaking, leadmen

---

[2] A skid steer is a small—four-wheel or two-track—"versatile piece of construction equipment" that is commonly used "for various construction and landscaping jobs." BigRentz, Inc., *What is a Skid Steer?*, BIGRENTZ: BLOG (May 22, 2019), https://www.bigrentz.com/blog/what-is-a-skid-steer.

oversaw the hull and fiber manufacturing operation. *Twiggs Dep.* (Doc. 22-3) p. 7. Among those who applied for the position were Williams and Ben Burdeshaw (a White male). *Williams Dep.* (Doc. 22-1) pp. 161–62. After conducting interviews, a three-person panel—consisting of Superintendent E.J. West, Assistant Superintendent Josh Knight, and Plant Manager Allen Twiggs—concluded that Burdeshaw was the most qualified candidate and awarded him the position. *West Dep.* (Doc. 22-4) pp. 12, 14; *Knight Decl.* (Doc. 22-5) pp. 3–4; *Twiggs Decl.* (Doc. 22-6) pp. 2–4.

During the following months, Williams filed four internal grievances with Golden Peanut's employee and relations department, alleging that West and Knight treated him differently based on his race. *Thornton Letter* (Doc. 29-5) p. 1. On September 18, 2018, Golden Peanut informed Williams via letter that it had investigated his grievances and found them unsubstantiated. *Id.* The letter also notified Williams that he could be disciplined for filing bad-faith grievances against a coworker. *Id.* at 1–2. Williams perceived the letter as a threat and, in late 2018, began consulting with a lawyer. *Williams Dep.* (Doc. 22-1) pp. 46, 63.

In January 2019, Williams filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that he did not receive the leadman position because of his race. *Id.* at 163. Later that month, another leadman position became available at the hull and fiber plant. *Id.* at 39, 167. Williams applied for the position, as did Houston Estes (a White male). *Id.* at 39. West, Knight, and Twiggs conducted interviews, concluded that Estes was the most qualified applicant, and awarded him the position. *West Dep.* (Doc. 22-4) pp. 9–10; *Knight Decl.* (Doc. 22-5) pp. 4–6; *Twiggs Decl.* (Doc. 22-6) pp. 4–6.

After learning he did not receive the position, in March 2019, Williams filed another EEOC charge—this time with the assistance of counsel. *Williams Dep.* (Doc. 22-1) pp. 42, 46, 167. Williams alleged that Golden Peanut did not select him for the January 2019 leadman position because of his race. *Id.* at 167. The following month, Williams resigned from Golden Peanut after securing a higher paying job with a different company. *Id.* at 43–44, 169. His employment officially ended on May 10, 2019. *Id.* at 44, 169. That same day, the EEOC mailed Williams a letter notifying him of the dismissal of his January 2019 charge and of his right to sue in federal court. *Id.* at 164.

In June 2019, the bankruptcy court granted Williams a discharge of his bankruptcy. *Discharge Order* (Doc. 22-8) p. 2. Although he was represented by counsel during the entirety of his bankruptcy case, Williams failed to inform his attorney about his EEOC charges or amend his bankruptcy filings to disclose his EEOC charges. *Pl.'s Resp.* (Doc. 26) pp. 9–10; *Bankruptcy Pet.* (Doc. 22-7) p. 7; *Discharge Order* (Doc. 22-8) p. 4; *Bankruptcy Docket* (Doc. 22-10) pp. 2–6. Neither the bankruptcy court, bankruptcy trustee, nor any creditor knew of Williams's pending civil claims at the time of discharge. *Pl.'s Resp.* (Doc. 26) p. 10.

The following month, the EEOC sent Williams another right-to-sue letter, notifying him that it had dismissed his March 2019 charge. *Williams Dep.* (Doc. 22-1) p. 168. Then, in August 2019, Williams sued Golden Peanut in state court for race discrimination and unlawful retaliation under Title VII. *Compl.* (Doc. 1-1) pp. 1, 3–6. Golden Peanut removed the action to federal court and moved for summary judgment on Williams's claims. *Notice of Removal* (Doc. 1) p. 1; *Def.'s Summ. J. Mot.* (Doc. 20) p. 1.

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment a court must "view the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 707 (11th Cir. 2019).

To survive summary judgment, a nonmovant must assert facts that make a sufficient showing on every essential element of his case on which he bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Factual assertions must cite to specific materials in the record, including affidavits, depositions, declarations, interrogatory answers, among other materials. FED. R. CIV. P. 56(c). Unsupported conclusions and factual allegations are insufficient to create a genuine issue of material fact. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Also insufficient are allegations based on speculation. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Indeed, the purpose of summary judgment is to identify and dispose of cases where the evidence is insufficient to merit holding a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.   DISCUSSION

Judicial estoppel bars Williams's instant claims. Judicial estoppel is an equitable doctrine intended to protect the integrity of the judicial process "by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). The Eleventh Circuit has developed a two-step test for determining whether judicial estoppel bars a party from pursuing a civil claim that he did not disclose in a separate bankruptcy proceeding. *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 643 (11th Cir. 2019).

At the first step, the inquiry is whether a plaintiff took a position under oath in a bankruptcy proceeding that is inconsistent with his pursuit of a civil claim. *Weakley v. Eagle Logistics*, 894 F.3d 1244, 1246 (11th Cir. 2018) (per curium). When filing for bankruptcy, a debtor must disclose all of his assets and potential assets to the bankruptcy court. *Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1344 (11th Cir. 2006). He then has a continuing duty to amend his filings should a potential civil claim arise while his bankruptcy remains pending. *Harewood v. Miami-Dade Cnty.*, 780 F. App'x 748, 751 (11th Cir. 2019) (per curium); *see also D'Antignac v. Deere & Co.*, 604 F. App'x 875, 878 (11th Cir. 2015) (per curium). This includes EEOC charges, which constitute "other contingent and unliquidated claims." *Casanova v. Pre Sols., Inc.*, 228 F. App'x 837, 841 (11th Cir. 2007) (per curium).

Here, Williams filed for Chapter 13 bankruptcy in January 2015. *Bankruptcy Pet.* (Doc. 22-7) pp. 6–7. In doing so, he swore under penalty of perjury that he had no

6

contingent or unliquidated claim of any kind. *Id.* at 15, 44. Williams then filed two EEOC

charges, one in January 2019 and the other in March 2019, while his bankruptcy remained

pending. *Williams Dep.* (Doc. 22-1) pp. 163, 167; *Discharge Order* (Doc. 22-8) p. 2. He

failed, however, to amend his bankruptcy filings to disclose his potential civil claims before

his bankruptcy was discharged in June 2019. *Pl.'s Resp.* (Doc. 26) p. 9; *Bankruptcy Docket*

(Doc. 22-10) pp. 2–5. Accordingly, the Court finds that Williams took a position under

oath in his bankruptcy that is inconsistent with the pursuit of his instant claims. The Court

therefore proceeds to the second step of the judicial estoppel test.

Under the second step, the inquiry is whether a plaintiff took inconsistent positions

"to make a mockery of the judicial system." *Slater*, 871 F.3d at 1180. This standard is met

if a plaintiff acts with the deliberate intent to mislead. *Id.* at 1187. In determining a

plaintiff's intent, a reviewing court must examine "all the facts and circumstances of the

particular case." *Id.* at 1185. A court may consider any fact or factor it deems relevant to

the inquiry; there is no exhaustive list of relevant factors. *Id.* at 1185 n.9.

Still, the Eleventh Circuit has provided a number of factors that are often relevant

to the intent inquiry. *Id.* at 1185–86. Pertinent examples include: (1) whether the plaintiff

corrected his bankruptcy filings; (2) whether the plaintiff had legal counsel during his

bankruptcy; (3) if he was represented by counsel, whether the plaintiff disclosed his

potential civil claims to his bankruptcy attorney; (4) whether the bankruptcy court

discovered the omission before discharging the case and, if so, whether the bankruptcy

court made any finding or took any action against the plaintiff as to his omission; and

(5) whether the bankruptcy trustee or the plaintiff's creditors were aware of the plaintiff's

potential civil claims before the bankruptcy was discharged. *See id.* at 1185–86. Also

relevant is a plaintiff's level of sophistication. *Id.* at 1185.

In this case, considering the aggregate weight of these factors, the Court finds that

Williams acted with the deliberate intent to mislead the judicial system. First, Williams

failed to amend his bankruptcy filings to disclose his potential civil claims. *Pl.'s Resp.*

(Doc. 26) p. 9; *Bankruptcy Docket* (Doc. 22-10) pp. 2–5. Especially troubling is the fact

that Williams amended his bankruptcy filings on at least one occasion before filing his

EEOC charges. *Bankruptcy Docket* (Doc. 22-10) p. 4. Minimally, this suggests that

Williams understood he could amend his bankruptcy filings to disclose his potential civil

claims.

Second, Williams had legal counsel during the entirety of his bankruptcy, that is,

from filing to discharge. *Bankruptcy Pet.* (Doc. 22-7) p. 7; *Discharge Order* (Doc. 22-8)

p. 4; *Bankruptcy Docket* (Doc. 22-10) pp. 2–6. Third, he failed to inform his bankruptcy

attorney of his potential civil claims. *Pl.'s Resp.* (Doc. 26) p. 10. Moreover, Williams filed

his second EEOC charge with the assistance of counsel. *Williams Dep.* (Doc. 22-1) p. 46.

Williams therefore had legal representation during the three months between filing his

second EEOC charge and the discharge of his bankruptcy. *Id.* at 46, 167.

Fourth, the bankruptcy court never discovered Williams's potential civil claims.

And because Williams did not amend his filings to disclose his potential civil claims, he

deprived the bankruptcy court of the opportunity to take any action or make any finding as

to those claims before discharging his bankruptcy. Fifth and finally, neither the bankruptcy

trustee nor any creditor was aware of Williams's potential civil claims before his bankruptcy was discharged. *Pl.'s Resp.* (Doc. 26) p. 10.

To be sure, Williams's lack of sophistication weighs in his favor. Williams lacks a high school diploma or a GED, and has no specialized training other than his certifications to operate a skid steer and a forklift. *Williams Dep.* (Doc. 22-1) p. 6–7. But this factor alone is insufficient to outweigh the aggregate of the relevant factors described above. Thus–considering the summary judgment record as a whole and viewing the evidence in the light most favorably to Williams—the Court finds that Williams acted with the deliberate intent to mislead the judicial system when he failed to amend his bankruptcy filings to disclose his EEOC charges. The doctrine of judicial estoppel therefore bars Williams's claims in this case.

## IV. CONCLUSION

Williams's claims cannot survive summary judgment. First, Williams took a position under oath in his bankruptcy that is inconsistent with the pursuit of his instant claims. Second, he took his inconsistent positions with the deliberate intent to mislead the judicial system. Accordingly, judicial estoppel bars Williams's claims. The Court therefore GRANTS Golden Peanut's motion for summary judgment (Doc. 20) and DISMISSES Williams's claims WITH PREJUDICE. The Court will enter a final judgment separately.

DONE this 7th day of May, 2021.


Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE